UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

MICHAEL DEVON MILLER,

      Petitioner,

v.                                    Case No. 4:22cv354-AW-HTC

RICKY D. DIXON,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Michael Devon Miller filed a petition under 28 U.S.C. § 2254, challenging his conviction and sentence in the circuit court of Lafayette County, Florida, in case no. 2013 CF 62. Doc. 1. After considering the petition, the record, the Secretary's response, Doc. 9, and Petitioner's reply, Doc. 14, the undersigned recommends the petition be DENIED without an evidentiary hearing.

## I.    BACKGROUND

### A.    Offense and Conviction

Petitioner was convicted of several crimes stemming from driving his car, while intoxicated, into a motorcycle carrying two brothers which resulted in serious injuries to the brother who was the passenger on the motorcycle (Timothy Lucier) and the death of the brother who was driving it (Kenneth Lucier).

In the early morning hours of December 7, 2013, Petitioner was driving a Mustang on State Road 27 after a night of drinking with his friend, Archie Edwards, who was sleeping in the passenger's seat. Doc. 9-4 at 119-20. The weather was very foggy. Doc. 9-4 at 124, 168, 212 & 227. Meanwhile, just ahead of the Mustang, Kenneth Lucier drove his motorcycle carrying Timothy Lucier as a passenger. At trial, Timothy testified they were driving 40 to 50 miles per hour on the road when he told his brother to slow the motorcycle down. *Id.* at 41. He then saw lights "growing faster upon the grass," indicating that a car was approaching quickly from behind them, and then they were "hit hard" from behind. *Id.* This threw Timothy off the motorcycle and onto the shoulder, breaking bones and resulting in a concussion and severe internal injuries. *Id.* at 41-44. The driver, Kenneth, was thrown into the roadway where he was run over by a semi-truck driven by Alexander Brooks, killing Kenneth. *Id.* at 179 (truck driver's testimony) & 358 (medical examiner's testimony). Petitioner, his passenger in the Mustang, and the driver of the truck were not injured in the crash.

After the impact, Petitioner and Edwards got out and made contact with Timothy on the side of the road. At trial, Timothy testified Petitioner asked "the other guy" to say he was driving rather than Petitioner (he did not specify which "other guy" Petitioner had asked). Doc. 9-4 at 54. Also, Timothy testified Petitioner "smelled of – he reeked of alcohol." Doc. 9-4 at 56. Edwards testified he and Petitioner had been drinking beer all afternoon and evening. *Id.* at 129-32.

After hitting something in the road, Brooks stopped his truck and walked back to the scene, joining Petitioner, Edwards, and Timothy. *Id.* at 172-74. Brooks testified Petitioner admitted to him that Petitioner had been drinking and asked Brooks to pretend he was driving the Mustang. *Id.* at 174. Brooks also testified he could smell alcohol coming from Petitioner. *Id.* at 175. When he looked back at the Mustang, Brooks saw the motorcycle embedded in it. *Id.* at 178.

Brooks called 911, and County Deputy Harris was the first to arrive. Harris testified that he saw the motorcycle embedded in the front of the Mustang and a beer can lying just outside the driver's door in the grass. *Id.* at 214. He did not perform any investigation, however, instead calling the Florida Highway Patrol ("FHP") to work the investigation. *Id.* at 218-19. Harris testified he did *not* smell any alcohol on Petitioner or notice any signs of impairment. *Id.* at 218-19.

The first FHP officer to arrive was Sergeant Bruce Simmons, an FHP traffic homicide investigator and the supervisor on the scene that night. *Id.* at 227-29 & 243-44. He testified that he personally interacted with Petitioner, "could smell an odor of an alcoholic beverage" on him, and noticed he was very talkative, which Simmons knew to be a sign of alcohol impairment. *Id.* at 232. However, he admitted he did not prepare a report or any written notes about his investigation that night, stating it was "not my role." *Id.* at 245-46 & 249.

Simmons testified at trial simply that he asked Petitioner to give a blood sample and Petitioner agreed. *Id.* While that is true, the process of getting consent

for the blood draw at the scene was somewhat more complicated and actually resulted in a motion to suppress, in which Petitioner argued his consent was not voluntarily given. An evidentiary hearing was held on the motion. Doc. 9-1 at 52.

At the hearing, Corporal Linda Albritton, the lead investigator, testified she told Petitioner there would be "a sergeant who's going to be coming on scene, and I was going have him to submit to a blood, for a voluntary sample" and Petitioner said, "Okay." Doc. 9-1 at 75. She later testified "I had asked Sergeant Simmons to get the blood draw from Mr. Miller while I was trying to finish cleaning up the scene." *Id.* at 78-79. She testified that, after Sergeant Simmons observed the blood draw, he gathered the blood samples and gave them to her, and she placed them in the temporary storage facility at the station. *Id.* at 79. She stated that she did not observe the actual blood draw and that Petitioner never refused to take a blood draw in her presence. *Id.* at 101.

Sergeant Simmons testified at the evidentiary hearing that when he approached Petitioner and asked him if he would voluntarily give a consent for a blood withdrawal, Petitioner initially agreed. *Id.* at 115. Simmons then went and got the consent paperwork for him to sign, took Petitioner to the ambulance with the blood kit and paperwork, and read the consent paperwork to Petitioner. *Id.* When Simmons asked Petitioner for his signature, Petitioner said "No." *Id.* Simmons then testified he verified with Petitioner that he was refusing the voluntary blood withdrawal and then explained the procedure for him from that point: "that we would

have to go and get a warrant and have a judge sign it during the night and then we could take the blood, if we had to." *Id.*  Simmons testified that, as he stood up to leave, Petitioner said "Okay" and held his arm out as if to say, "Okay, take the blood." *Id.* at 115-16.  Simmons testified Petitioner also eventually signed the consent paperwork for the blood draw.[1]  *Id.*  Two vials of blood were drawn by the paramedic in the ambulance.  Doc. 9-4 at 239-41.

At trial, Sergeant Simmons authenticated that signed consent form and also the box containing the blood samples taken at the scene, although defense counsel raised a chain-of-custody issue because it appeared the box had been opened and resealed several times.[2]  *Id.* at 235-39.  The judge took the objection under advisement and allowed Simmons to testify that those vials were the blood taken from Petitioner by paramedics at the scene, put into the kit by Simmons, and given to FHP Corporal Albritton to put into her vehicle.  *Id.* at 239-41.  Simmons testified Trooper McGauley and Petitioner signed a second consent form in which Petitioner agreed to a second blood draw, this time at the hospital several hours later, *id.* at 258-59.

Trooper McGauley testified he was assigned to take Petitioner to the hospital

---

[1] The trial judge denied the motion to suppress, as discussed in Ground One, below.
[2] The State later called Judith Morelan, an evidence custodian for the FHP.  *Id.* at 310.  She authenticated the chain of custody documents for the blood samples and explained each time the kits were opened and resealed while in FHP custody.  *Id.* at 311-16.  Later, the analyst and technical leader of the Florida Department of Law Enforcement ("FDLE") toxicology laboratory explained the chain of custody of the samples while in FDLE custody.  *Id.* at 324 & 328-30.

and Petitioner agreed to a second blood draw at the hospital, which McGauley personally observed.  *Id.* at 277-78.  McGauley then collected the vials, put them into the kit, sealed the kit and turned it over to Corporal Albritton.[3]  *Id.* at 281.  He authenticated that kit at the trial.  *Id.* at 282.  Trooper McGauley testified Petitioner told him "he's been there long enough by now he's sober" and McGauley "could detect an odor of an alcoholic beverage coming from his person as he was speaking." *Id.* at 285.  However, Trooper McGauley admitted he had authored a report but did not include any reference to smelling alcohol on Petitioner or noticing any signs of impairment.  *Id.* at 295-96.  On redirect, he explained the report he authored was only intended to document the blood draw and was not a general investigative report. *Id.* at 298 & 300.

The paramedic who took blood from Petitioner at the scene testified Petitioner did not appear to be under the influence of alcohol and the paramedic did not notice the odor of alcohol coming from him.  *Id.* at 270.  Likewise, the phlebotomist who drew blood from Petitioner at the hospital testified she did not smell alcohol on his breath or see signs of impairment.  *Id.* at 306.  However, Petitioner told her, after the delay from all the attempts to draw his blood at the hospital, "I'm glad they've messed around so long because whatever I had in my system isn't going to be there

---

[3] At the motion to suppress hearing, Corporal Albritton testified McGauley brought the second samples to her, and she took them to the temporary storage facility. Doc. 9-1 at 82.  She described the security procedures used to maintain the chain of custody.  *Id.* at 82-83.

anymore." *Id.* at 304.

The FDLE toxicologist testified that each of the vials of Petitioner's blood taken at the scene showed a blood alcohol level of 0.193 grams per 100 milliliters, *id.* at 330, which is almost two-and-a-half times the legal limit.[4]  The samples taken at the hospital many hours later showed a level of .081, *id.*, which is still higher than the legal limit.

In its case, the defense offered the testimony of Chet Tomlinson as an expert in accident reconstruction who explained various theories in which the accident was not the fault of Petitioner.  *Id.* at 402.  First, he testified the motorcycle was travelling at an unsafely low speed.  The posted speed limit was 60 miles per hour ("mph") and he calculated the motorcycle was traveling at either 20 mph, *id.* at 439, or 29 mph, *id.* at 443 (depending on which test he used) and the Mustang was traveling at 61 mph.  *Id.* at 435.  He testified that having two grown men on the motorcycle would have limited its maneuverability and acceleration.  *Id.* at 422.  Also, the low speed of the motorcycle "would impede or hinder the normal flow of traffic."  *Id.* at 417.

He also testified the motorcycle should have been near the outside line of the lane when travelling in the fog at that speed but was actually closer to the center lane.  *Id.* at 414-17.  In fact, he opined that if the motorcycle had been hugging the

---

[4] *See* Florida Statutes § 316.193(1)(b) which makes it a crime to drive a vehicle with "a blood-alcohol level of 0.08 or more grams of alcohol per 100 milliliters of blood".

outside line (which he called the "fog" line), *id.* at 413, the accident would have been avoided. *Id.* at 416. He testified he could not prove the brake lights of the motorcycle were working but admitted that when he examined the motorcycle, "due to the deformation from the collision, the bulb and the filament were no longer present." *Id.* at 409-10.

Tomlinson concluded that at the speed the Mustang and the motorcycle were traveling in those foggy conditions, the Petitioner would have had only .85 of a second to react once the motorcycle was visible to him. *Id.* at 433. In fact, he testified there were no skid marks from the Mustang, only the skid mark formed by the tire of the motorcycle as it was dragged by the Mustang. *Id.* at 410-11.

Part of Tomlinson's testimony, however, also confirmed the State's theory of the case and contradicted the defense's. He testified that his calculations showed the Mustang hit the motorcycle from behind while the motorcycle was carrying its two passengers, throwing the passengers off and causing the motorcycle to be wedged into the front of the Mustang. *Id.* at 436. The defendant had argued something different in his opening statement: "At some point Kenneth Lucier lost control of that motorcycle and both he and his brother were thrown off." *Id.* at 394. Moments later, "[t]hat motorcycle was up on the yellow line, right there in the middle of both those two lanes . . . when bam, that motorcycle smashed into the front end of his vehicle." *Id.* at 394-95.

Petitioner was convicted of six offenses, Doc. 9-5 at 28-31, but the state

pursued sentencing on only three of them: driving under the influence and causing the death of another human being in violation of section 316.193, Florida Statutes (Count I), for driving under the influence and causing serious bodily injury, contrary to section 316.193(3), Florida Statutes (Count III), and for driving under the influence and causing property damage in violation of section 316.193(3), Florida Statutes (Count IV). Doc. 9-6 at 7 (sentencing hearing). He was sentenced to 29 ½ years on Count I, five years on Count III, and 1 year on Count IV, with all sentences running concurrently. Doc. 9-5 at 14.

### B.    Postconviction History and Timeliness

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for habeas relief must be filed within one year of certain trigger dates – the pertinent one here being one year from final judgment. 28 U.S.C. § 2244(d)(1)(A). Properly filed post-conviction motions, such as a motion under Florida Rule of Criminal Procedure 3.850, will toll the limitations period until the motion is fully resolved. *Id.* at § 2244(d)(2).

Petitioner appealed the judgment and conviction to the First District Court of Appeals ("First DCA"), which affirmed with a written opinion. *See Miller v. State*, 250 So. 3d 144 (Fla. 1st DCA 2018); Case No. 1D16-2020. The Florida Supreme Court denied discretionary review, *Miller v. State*, No. SC18-1527, 2019 WL 1375044 (Fla. Mar. 27, 2019), and also denied his motion for rehearing (treated as a

motion for reinstatement) on April 11, 2019.[5]  *See Miller v. State*, No. SC18-1382, 2019 WL 1567754 (Fla. Apr. 11, 2019).  He did not file a petition in the United States Supreme Court, so the conviction became final ninety (90) days later, or on July 10, 2019, when the time for filing such a petition expired.  *See Nix v. Sec'y for Dept. of Corr.*, 393 F.3d 1235, 1236-37 (11th Cir. 2004).

The AEDPA time ran for 25 days,[6] until Petitioner filed a post-conviction petition for habeas relief alleging ineffective assistance of appellate counsel in the First DCA on August 5, 2019.  Doc. 9-12.  It was denied on the merits on November 20, 2019.  *See* Case No.: 1D19 2852.  On June 10, 2020, Petitioner filed a Florida Rule 3.850 motion.  Doc. 9-16 at 28.  That motion continuously tolled the AEDPA time limit, through its denial, *id.* at 50, and an appeal, until the First DCA issued its mandate on August 24, 2022.  Doc. 9-18.  On September 20, 2022, Petitioner filed the current § 2254 petition.  Doc. 1 at 20.  Because 365 days of untolled time had not expired at the time Petitioner filed the instant petition, it is timely.

---

[5] The Respondent, without discussion, did not include this motion in its analysis of the finality date of the conviction.  This court has previously held that a motion for reinstatement of the Florida Supreme Court's denial of discretionary review delays the finality date of the conviction.  *Acoff v. Inch*, No. 5:19CV215-MCR-HTC, 2020 WL 10229082, at *3 (N.D. Fla. Nov. 30, 2020), *report and recommendation adopted*, No. 5:19CV215-MCR-HTC, 2021 WL 2690502 (N.D. Fla. June 29, 2021); *see also*, *Butler v. Sec'y, Fla. Dep't of Corr.*, 621 F. App'x 604, 605 (11th Cir. 2015) (holding that ninety-day period for seeking certiorari from United States Supreme Court began running after Florida Supreme Court denied Petitioner's motion for rehearing).

[6] Respondent states that 41 days elapsed before the state habeas petition was filed, but that is incorrect.  *See* Doc. 9 at 7.

## II.    LEGAL STANDARDS

### A.    The AEDPA

The AEDPA governs a state prisoner's petition for habeas corpus relief.  28

U.S.C. § 2254.  Under the AEDPA, relief may only be granted on a claim adjudicated

on the merits in state court if the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This standard is both mandatory and difficult to meet.  *White*

*v. Woodall*, 572 U.S. 415, 419 (2014).  "Clearly established federal law" consists of

the governing legal principles set forth in the decisions of the United States Supreme

Court when the state court issued its decision.  *Id.*  A decision is "contrary to" clearly

established federal law if the state court either: (1) applied a rule that contradicts the

governing law set forth by Supreme Court case law; or (2) reached a different result

from the Supreme Court when faced with materially indistinguishable facts.  *Ward*

*v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010); *Mitchell v. Esparza*, 540 U.S. 12, 16

(2003).

A state court decision involves an "unreasonable application" of Supreme

Court precedent if the state court correctly identifies the governing legal principle,

but applies it to the facts of Petitioner's case in an objectively unreasonable manner,

*Brown v. Payton*, 544 U.S. 133, 134 (2005); *Bottoson v. Moore*, 234 F.3d 526, 531 (11th Cir. 2000), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Bottoson*, 234 F.3d at 531 (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Some of Petitioner's grounds for relief are premised on ineffective assistance of trial counsel ("IATC"). An IATC claim requires a showing that (1) counsel's performance during representation fell below an objective standard of reasonableness, and (2) prejudice resulted, *i.e.*, that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential. *Id.* at 689. The defendant bears the burden of proving that counsel's performance was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Id.* at 688-89

*Strickland*'s prejudice prong requires a petitioner to allege more than simply

that counsel's conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The petitioner must show a reasonable probability exists that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Bare allegations the petitioner was prejudiced by counsel's performance are not enough. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987).

## III.  DISCUSSION

### A.    Ground One: Trial Court Error in Denying Motion to Suppress Blood Draw Results

In Ground One, Petitioner argues his Fourth Amendment rights were violated when law enforcement took his blood, which he contends was without probable cause and without his consent.[7] Thus, Petitioner argues the trial court erred in denying his motion to suppress the evidence from the blood draws. Petitioner is not entitled to habeas relief because the state courts afforded him a full and fair opportunity to address this alleged violation.

In *Stone v. Powell*, 428 U.S. 465 (1976), the United States Supreme Court determined that "where the State has provided an opportunity for full and fair

---

[7] Respondent argues that Petitioner has failed to exhaust any claim that the trial court erred in determining that samples were taken in violation of Florida's implied consent law, Fla. Stat. § 316.1932, because Petitioner did not have a Florida driver's license or because the consent forms were not properly completed. The undersigned agrees; Petitioner did not raise this claim in his direct appeal. Regardless, Petitioner would not be entitled to relief on the merits of this claim because a "state's interpretation of its own laws or rules provide no basis for federal habeas relief." *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1992).

litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 494. "'[F]ull and fair consideration' in the context of the Fourth Amendment includes 'at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute.'" *Bradley v. Nagle*, 212 F.3d 559, 564-65 (11th Cir. 2000) (quoting *Caver v. Alabama*, 577 F. 2d 1188, 1191 (5th Cir. 1978)).

Here, Petitioner filed a motion to suppress, Doc. 9-1 at 14, and the state court held an evidentiary hearing. *Id.* at 66. The state court considered the arguments of counsel and the testimony of the state troopers involved and denied the motion in a written order, Doc. 9-2, finding "[t]he Defendant did freely and voluntarily consent to providing the blood samples. Any and all other grounds for suppression are moot by this finding." *Id.* at 2. Petitioner then filed a direct appeal with the First DCA (Case No.: 1D16-2020), in which he raised the same argument he makes in this Ground. Doc. 9-7. The First DCA affirmed the denial of his motion to suppress in a written opinion, finding "[the facts and circumstances in this case demonstrate that Miller freely and voluntarily consented to the blood withdrawal." *Miller v. State*, 250 So. 3d 144, 145 (Fla. 1st DCA 2018).

Because the State provided Petitioner a "full and fair" opportunity to litigate his Fourth Amendment claim in the state courts, Petitioner is not entitled to habeas

relief on this claim.  *See Bradley*, 212 F.3d at 564-65 ("so long as a defendant has had the opportunity to present his Fourth Amendment claims to the state trial and appellate courts, the objectives of the exclusionary rule have been satisfied").

**B.    Ground Two: Trial Court Error in Granting Motion in Limine Precluding Admission of Victim's Driver's License Status**

Petitioner argues that the trial court erred by precluding him from presenting evidence that Kenneth Lucier was driving a motorcycle without an endorsement when he and his brother were hit by Petitioner from behind, because this evidence was relevant to Petitioner's defense that the victim's conduct was the sole cause of the accident.  Petitioner exhausted this claim by raising it on direct appeal.  Doc. 9-7.  The First DCA denied the claim because "evidence was presented that Miller had been drinking on the night of the incident, had a blood alcohol content higher than 0.08, and was excessively speeding prior to the crash."  *Miller*, 250 So. 3d at 146. The First DCA's determination was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.  28 U.S.C. § 2254(d).

"In habeas corpus proceedings, federal courts generally do not review a state court's admission of evidence."  *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998) (citing *McCoy v. Newsome,* 953 F.2d 1252, 1265 (11th Cir.1992)).  A federal court "will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial."  *Id.*; *Baxter v. Thomas*,

45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling claims reviewed only to determine whether the error "was of such magnitude as to deny fundamental fairness"), *cert. denied,* 516 U.S. 946 (1995).  Additionally, such trial court errors are subject to the harmless error analysis and will not be the basis of federal habeas relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993) (quotation omitted).

Petitioner has not come close to showing the refusal to admit this evidence denied him fundamental fairness or had a substantial and injurious effect on the jury's determination.  First, as the First DCA explained, even had the judge admitted Kenneth Lucier's driver license status, "no reasonable jury would conclude that the decedent's lack of a motorcycle endorsement was the sole proximate cause of the accident." *Miller*, 250 So. 3d at 146.

Second, the evidence was cumulative since Petitioner was able to present his theory of the defense through his expert.  Specifically, Petitioner was able to offer his theory that the victim motorcycle driver was responsible for the crash through his accident reconstruction expert witness.  The expert testified that his calculations showed the motorcycle was going 20 mph at impact, which was far below the posted 60 mph speed limit and impeded the normal flow of traffic.  He explained that, by the time the motorcycle was visible to Petitioner, Petitioner had less than .8 of a second, insufficient time to react.  The expert witness also testified that the motorcycle was not designed for two riders and that two riders would negatively

affect its' maneuverability and handling under the foggy, wet road conditions. He testified no light fragments were found near the broken taillight and he could not determine when the taillights were broken, before or during the accident. He observed no evidence indicating that the bodies hit the Mustang, which would have been expected if the Mustang collided with the motorcycle.

Petitioner's argument that he was precluded from explaining "why" Lucier caused his own death is simply without merit. Why Lucier was unable to control the motorcycle (as the expert contends) is not material to what caused the accident. Regardless, even if such information would have added anything to the expert's testimony, an evidentiary ruling does not infringe the right to mount a defense if the excluded testimony merely "would have been helpful," *United States v. Gillis*, 938 F.3d 1181, 1195 (11th Cir. 2019), or if the ruling merely prevents defendant from "increas[ing] the quantity of witnesses who would tell the jury what other witnesses already said." *United States v. Mitrovic*, 890 F.3d 1217, 1222 (11th Cir. 2018). Petitioner is not entitled to habeas relief on Ground Two. 28 U.S.C. § 2254(d).

### C.    Ground Three:  IATC for Failing to Call Florida Highway Patrol Corporal Linda Albritton

In Ground Three, Petitioner takes issue with counsel's failure to call Cpl. Albritton as a witness even though she "is the officer that filed the charges on the defendant, no other officer did so." Doc. 1 at 26. Respondent reads this claim solely as a claim by Petitioner that his right to confront Cpl. Albritton was violated when

Trooper McGauley testified regarding Albritton's arrest reports.  Doc. 9 at 35.
Indeed, in the petition, Petitioner states "defense counsel didn't object to defendant's
confrontation rights being violated."  Doc. 1 at 26.  Respondent argues this is a new
claim that was not exhausted in the state courts and based on the Court's review of
the post-conviction motions and appeals, the Court agrees this is a new, unexhausted
claim.

Reading this ground of relief liberally in Petitioner's favor, it also appears
Petitioner is arguing, as he did in Issue One of his Rule 3.850 motion, that counsel
was deficient for failing to call Albritton as a witness because she was a material
witness.  Thus, the Court will also address this claim.

Because the First District issued a *per curiam* affirmance of the denial of the
Rule 3.850 Motion without a written opinion, Doc. 9-18 at 3, this Court will "look
through" that decision to the last related state-court decision that provides a relevant
rationale, presume that the unexplained decision adopted the same reasoning and
apply the AEDPA deference to that decision. *See Wilson v. Sellers*, 138 S. Ct. 1188,
1192 (2018).  Here, that last decision comes from the circuit court's Order Denying
Motion for Postconviction Relief.  Doc. 9-16 at 50.  In that order, the circuit court,
applying the *Strickland* test, found that Petitioner had not shown counsel's
performance was deficient or that he was prejudiced by any such deficiency.  This
conclusion was not contrary to, and did not involve an unreasonable application of,
clearly established Federal law, as determined by the Supreme Court.  28 U.S.C.

§ 2254(d).

First, as the circuit court pointed out, any evidence regarding whether Albritton should have been able to smell alcohol on Petitioner's breath would be cumulative. Doc. 9-16 at 53. Defense was able to make the point that several witnesses – some of whom dealt closely with Petitioner in enclosed places – did not remember smelling alcohol on him. Thus, he was able to make the point that he would have tried to make had Albritton been called to testify.

Second, Petitioner fails to explain how Albritton's testimony would have been helpful to him. "A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted); *see also, Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

As the circuit court pointed out, the two blood draws came back showing a blood alcohol level of .193 and .081; thus, Albritton's report, standing alone, was not the basis of the charges against Petitioner. Thus, the circuit court was not unreasonable in concluding, "The Defendant cannot establish a substantial likelihood the results of the trial would have been different had counsel questioned

M. Cpl. Albritton regarding why her probable cause affidavit did not reference her detection of the odor of alcohol." Doc. 9-16 at 29.

Indeed, one would expect Albritton's testimony to be damaging to Petitioner's case rather than helpful. Albritton would be expected to testify consistently with her testimony at the motion to suppress hearing, where she was subject to cross-examination. In that testimony, Albritton testified Petitioner smelled like alcohol and confirmed the security procedures she followed to ensure the chain of custody of the blood draws. Doc. 1 at 82-83. Her testimony as to when and why the blood kit was opened by her was corroborated by the FHP evidence custodian, Doc. 9-4 at 311-16, and showed no possibility of tampering. Thus, Petitioner does not show how defense counsel could have swayed the jury by calling Albritton.

Moreover, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that federal courts will seldom, if ever, second guess." *Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1340 (11th Cir. 2019) (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995)). Petitioner has not provided any reason to second guess the decision not to call Corporal Albritton. Petitioner is not entitled to habeas relief on Ground Three.

### D.    Ground Four: IATC for Failing to Object to Hearsay Testimony by Trooper McGauley

Petitioner argues counsel "was ineffective when he failed to object to hearsay testimony from trooper McGauley concerning facts originating from Cpl. Linda

Albritton with reference to consent forms for two boxes of blood samples in Cpl. Albritton's name and preserve hearsay claims for direct review." Doc. 1 at 29. Petitioner exhausted this claim by raising it as Issue Two in his Rule 3.850 motion, Doc. 9-16 at 33, and on appeal. The circuit court denied relief because Petitioner could not establish either deficient performance or prejudice. This conclusion was not contrary to, and did not involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court. 28 U.S.C. § 2254(d).

First, Trooper McGauley did not make any hearsay statements in his testimony. That is, he never testified to "facts originating from Cpl. Linda Albritton with reference to consent forms for two boxes of blood samples in Cpl. Albritton's name." Instead, he testified to things he personally did and observed. He testified he obtained the consent form from Petitioner, Doc. 9-4 at 278-79, personally obtained a blood kit from his vehicle and gave it to hospital personnel, *id.* at 279, personally observed the phlebotomist take the blood, *id.* at 280, took them back from her, sealed them, labeled them and put them back into the blood kit. *Id.* at 280-81. He then gave the sealed-up blood kit to Corporal Albritton. *Id.* at 281. He further testified that he recognized his handwriting on the vials produced at trial and that these "are the blood samples that were collected from Mr. Miller at Shands at Live Oak." *Id.* at 281. He was then asked, "And those have obviously been opened at the lab and the kit itself has been opened since then, but are the tubes in substantially the same condition as when you last saw them?" He replied, "The best that I can see

the tubes, yes, they are." *Id.* at 281-82. Nothing in this testimony is hearsay, and Petitioner does not explain precisely what testimony he thinks was hearsay or objectionable. Therefore, this claim is without merit.

Second, Petitioner argues "Albritton's reports and observations are the crux of the case via her role as crash investigator and sole generator of all probable cause and reports in this case" but does not explain how that renders the testimony of McGauley objectionable or require her testimony. Petitioner offers no legal support for the idea that the lead investigator must testify when the testimony of other witnesses is sufficient to prove the crime.

Finally, the undersigned agrees with the circuit court that Petitioner could not show prejudice even if McGauley's testimony about the condition of the vials was somehow hearsay. Petitioner simply does not allege anything more than empty speculation about what "condition" he believes the vials ended up in or how that shows any tampering. To the contrary, as the circuit court explained, Doc. 9-16 at 55, the chain of custody of the vials showing no opportunity for tampering was put into evidence by the paramedics, the officers, the FHP evidence custodian and FDLE technical laboratory leader. Petitioner does not point to any evidence showing that the vials had been tampered with, mislabeled, or were otherwise not what they appeared to be. "The allegations must be factual and specific, not conclusory. Conclusory allegations are simply not enough to warrant a hearing" or habeas relief. *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011)

## IV.    CONCLUSION

### A.    Evidentiary Hearing

The undersigned finds that an evidentiary hearing is not warranted.    In deciding whether to grant an evidentiary hearing, this Court must consider "whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).    Additionally, this Court must consider the deferential standards prescribed by § 2254.    *See id.*    Upon consideration, the undersigned finds that the claims in this case can be resolved without an evidentiary hearing.  *See id.*

### B.    Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Court provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

After review of the record, the Court finds no substantial showing of the denial of a constitutional right.   § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, it is

also recommended that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "[B]efore entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Rule 11(a), Rules Governing 2254 Cases. If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully RECOMMENDED:

1.    That the petition under 28 U.S.C. § 2254, challenging the conviction in *State v. Miller*, Lafayette County, Florida, Case Number 2013 CF 62, Doc. 1, be DENIED without an evidentiary hearing.

2.    That a certificate of appealability be DENIED.

3.    That the clerk be directed to close the file.

At Pensacola, Florida, this 26th day of January, 2024.

*/s/ Hope Thai Cannon*

**HOPE THAI CANNON**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed **within fourteen (14) days** of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u>  An objecting party must serve a copy of its objections upon all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.